Good morning and may it please the court, Robert Ray for the appellant Aisha Babylonia and this particular appeal is a sentencing appeal only I represented the defendant in the district court before Judge Stein on appointment under the Criminal Justice Act. Your honors, the principal issue on this appeal is the following, were the reasons given by the district court sufficient to justify the magnitude of the departure? This was a sua sponte departure case, not a variance, and the magnitude here is a magnitude all the way up to the statutory maximum, which was five years. The sentencing guideline range was 30 to 37 months as found by the district court and the sentence therefore was The district court found that she was involved in, well she pled guilty to stalking Yes And that the stalking was an important part of an effort to murder someone and as a consequence of that attempted murder, an innocent bystander was shot. Why is that not a basis to go up to 60 months? Well there's no disputing the fact that the district court clearly had the authority to go to 60 months. I think the question we have here is that it was procedurally deficient for the reasons that we explain under departure law that predates the Supreme Court's decision in Booker. This is a departure that amounts to twice the bottom of the guideline range. It's a doubling of the sentence. There are five intermediate guideline ranges between that sentence and the sentence of 60 months. That's the first point. The second is What's the procedural error? Well the procedural error is that this court made clear in a number of decisions that a sequential analysis by the district court, starting with the applicable guideline range, which nobody disputes other than our issue with regard to whether or not she qualified for a minor role adjustment, but on the assumption that it was 30 to 37 months, there's a sequential analysis about why in between there and 60 months other ranges might have been appropriate and specifically here a more careful and precise evaluation of the relative responsibility that Ms. Babylonia played, even acknowledging, as Your Honor suggested, the authority of the district court. There's a photograph of Mr. Allen in response to the request for homework. Well and that was Significant participation, don't you think? Well it's a significant participation, but from the perspective of the people who were responsible for carrying out and hiring the shooter, identifying who the victim You know what Allen looked like. Correct. And she sends them a picture of Allen so that they would know what Allen looked like. And that was done at Roger Key's request. And the assumption seemed to be that she shared their intent. There was a trial with regard to that issue at which Ms. Babylonia was not a defendant. I think we've spilled over into a discussion of whether the sentence was substantively unreasonable. You started out saying it was procedurally unreasonable. Yes, Your Honor. Which are we or are we on both? Well I think it's fair to say we obviously have a challenge to both. I mean at the end of the day, we think this was a fundamentally unfair sentence to deal with the As to the procedural unreasonableness, there's not much to say, is there? She keyed them in on the guy who she wanted killed. That's it. Well, Your Honor, you say that she wanted him killed. That's not what she pleaded guilty to. We disputed that issue. The government permitted a plea here to a stalking offense, and specifically the allocution relative to an intent not to kill him, but an intent to stop the abuse. That's what she allocated to, that she would harass and stalk, and that's what she agreed to plead guilty to. The district court, I mean, I understand the point, but the district court really started with the premise, having, you know, sat the trial, that she was involved in the conspiracy to kill Matthew Allen. And further, the probation office, frankly, made the mistake as even assuming that she was ultimately responsible in part with these others for Matthew Allen's ultimate demise, which nobody claimed in the district court, including the government. Nobody made any allegation that she was involved in what ultimately led to Matthew Allen's death. So, you know, a lot of this makes sense if you operate from the assumption that she was involved in this conspiracy to murder, but that was something that was in dispute, which is one of the reasons that we asked for a hearing. I mean, what the district court you claim that the district court committed procedural error in failing to explain why the upward departure, right? Yes. But the district court left no mystery about that. He said, I find the defendant played a significant role in the plan to stalk and murder Matthew Allen, and that role is simply not captured in the guideline range. Is there really anything more to say? Well, we think there is more to say because the way it's supposed to work procedurally in the event of an upward departure is you're supposed to start with the guideline range and work from there to the sentence that the district court, a sentencing judge, ultimately arrives at. This one really was the other way around. It was essentially, Mr. Wray, on behalf of your client, tell me why I shouldn't impose the statutory maximum. And, you know, our point was, is that a sequential analysis is supposed to get at a more careful and precise evaluation of relative responsibility. She clearly wasn't as responsible as Roger Key for what transpired. She wasn't part of the Roger Key drug organization. She certainly wasn't as responsible as the shooter that was hired. And there was no evidence that she paid for this. It was also ---- So procedurally he had to go and say, we're starting at 37, and I think 46 is not adequate because, and I think 57 is not adequate because, and therefore I'm going to 60? I think that's the sequential analysis that this Court has used to guide upward departures. Now, you know, admittedly ---- I think if you're starting at 110 and you're going to 340, but 37 to 60, you have to break it down to that extent? Well, but it's a doubling of the sentence, Your Honor. I mean, it's not that much different if it were 150 months versus 300 months. That's still double. You know, 4 is doubling of 2, but it's not, like I say, it's different if you're going from 110 to 340. Fair point. It's not the same extent in terms of number of months as it would be if it were 150 to 300. But nevertheless, it's still a doubling of the sentence. That's a significant and substantial increase, which, as this Court has said in Aldine and Kalil, you know, requires the district court to specifically explain what the substantive basis is for a departure of that magnitude. The court clearly explained why he got to 60. And I ---- you're right. He didn't go step by step by step, but I don't think there are many district judges who would have gone through, you know, the ---- from 37 to 60. Well, but that's the analysis that this Court's prior decisions made clear before Booker that courts were required to do. Why? You know, look, the guideline range is supposed to be presumptively reasonable. If the Court decides that there is a consideration that the Sentencing Commission didn't adequately consider, that's a basis for an upward departure. And further, this is not just an upward departure case. This is an upward departure to the statutory maximum. Now, you know ---- Roberts. You have your point. You have two minutes for rebuttal. Thank you, Your Honor. Thank you. May it please the Court, my name is Charles Wilson. I was appointed to represent Mr. Davis in his appeal when I was formerly a member of the CJA panel, and the case came with me when I moved to the Federal Defender's Office in Connecticut about a year ago. This appeal here, I'm only going to focus on two of the three issues. I'm going to leave the sentencing issues to the brief and talk about the Curcio hearings and also whether there was an issue about the factual basis for his change of plea to the 924C conviction. In hearing my colleague present his arguments, I'm going to start right off by saying these are issues of procedure. How are we going to do things? How are we going to handle things? Starting with the Curcio hearing, probably the greatest problem with the two Curcio hearings that we have here is the absence of some counsel to be on standby and ready to answer questions. Now, the judge certainly asked ---- both times the court offered to adjourn and let him consult with independent counsel. You took the words out of my mouth there, Your Honor. I was going to point that out, and that's important. I can't stand here and say there was no mention of the idea, no mention of the concept, but certainly the ---- Does Curcio require that standby counsel be there and ready to go? It certainly encourages it. And while there are cases that have indicated that it hasn't happened, and those cases have still been allowed to proceed forward, but we have a problem here in that we have two Curcio hearings, two sets of problems with the same lawyer. Probably the first one is a little more disconcerting than the latter one in terms of how things turned out in the end, but it happened twice. The government asked for there to be a lawyer on standby, at least in connection with the first one. The district court, in handling a previous one, from what we can tell in the docket, had a standby lawyer available, and ultimately, this is a process question. If this court wants to say we don't need to have lawyers on standby, then this is a case to do it. But if ---- What substantive difference is there between having a lawyer there for the first part of the Curcio hearing and saying, if you would like to consult, we'll adjourn, give you a chance to consult? Frankly, that's the way I did it. I've been to Curcio hearings, both as the lawyer in both seats, and I would tell you that the difference is significant. So are you asking us to say that, henceforth, you have to have standby counsel there? I know it's hard for this Court to make blanket rules for every situation and not allow there to be exceptions, but this is a case where one should have been a ---- the lawyer should have been there. And you ask me, is there a substantive difference? Does it matter, essentially? And I would say for the defendant who is on the spot and is being told, well, maybe you're going to have this problem, maybe you're going to have that problem, if the defendant has someone else who is there to talk to about it for even just five minutes, that makes a difference. Well, I mean, one could argue that it's better to give him two days to go consult with counsel so that he's not rushed when he's being ---- and put on the spot right then and there in  It certainly is better, Your Honor. I don't know that anyone can disagree with that point. What amount of process is due is ultimately for this Court to decide. I know one judge in Connecticut, Judge Hall, she will bring in that second lawyer, have the lawyer meet with the defendant during a half hour or so beforehand. The lawyer is only there for that purpose. He isn't going to take the case away, so there's no incentive to rob prior counsel. Go ahead. Why don't you turn to the other issue, down to two minutes. All right. Just one last thing. Although it wasn't during Mr. Davis' part of the colloquy, it was with his father who preceded him. The judge did seem to think that he couldn't appoint a substitute counsel if the conflict truly materialized. He made a comment to, oh, your counsel is retained. Well, I can give you a lawyer for the consultation but not replace. That's an incorrect statement of the law. The defendant is entitled to a lawyer at every stage. If you can't afford for one, you can always apply, whether you're in the middle of the case or later. As to the other issues about the 924C and the factual basis for the plea, in terms of the things that we're talking about. In particular, could you address the effect of Rosemont on our? Certainly. So how Rosemont isn't satisfied in this colloquy that happens is it's never put to the defendant the question or he never makes the admission that he had any sort of advanced knowledge about the firearms. He certainly was aware of firearms. He uses the word aware four times, I believe. And he acknowledged that there was a benefit to having them around. He uses the word benefit twice. But it's never clear that he knew that that was going to be part of the deal, that he had an opportunity to withdraw from situations. And with any change of plea when we're searching for that factual basis in it, we can't draw it from inferences. He says, I was aware that from time to time others possessed a gun, a firearm, in furtherance of the conspiracy, and I never told them not to. It was a benefit. This assisted you. You know, it's you get the sense that they're planted around in various locations when you read the colloquy. And did you intend for others to carry, possess, and possess weapons in connection with your drug dealing from time to time? Yes. So, again, with Rosemont, I think there still has to be the question that's plain to the defendant, that's clear to the defendant, which is, so you knew in advance that there would be firearms available for when you're doing your drug deals. That's the question. But from time to time, doesn't that suggest that in advance of at least some actions taken in furtherance of the conspiracy, he had knowledge that they would be used? I mean, because he's saying that sometimes they would be, sometimes they wouldn't. I knew they might be. I think that's going to depend on the scenarios of the conspiracy, whether it's ongoing versus a one-time transaction. And that's where, and the last thing I'll add about Rosemont, because my time is out, is that Rosemont came after, if I'm correct, this change of plea, in terms it's a 2014 case, he pled in 2013. So I think that that impacts the considerations as well. All right. Thank you. May it please the court. Robert Caliendo from the Law Office of Mark Furnish. We represent Mr. Key. Your Honors, Judge Stein improperly lumped all of the supposed collective knowledge about the investigation together during the car stop. The government, in the oral argument after the hearing, the government conceded, this is in the government special appendix SA331, I understand this is all going to hinge on whether that knowledge that Special Agent Levanus had can be imputed to the rest of the team. Levanus is the one who worked up the case. Cabell was the one who actually directed the car to be stopped. And Judge Stein conceded in his decision, appendix 251, that Levanus, quote unquote, did not communicate his suspicion to the other officers. We recently put in a 28-J letter drawing the court's attention to Hussain, recently decided case. Yeah, unless my colleagues think otherwise, let's assume, just for the sake of argument, that we give you the point based on Hussain. And let's look instead at Cabell's independent knowledge for the stop. Absolutely. Cabell had virtually no information from Levanus. Cabell- Yeah, but what did he know on his own? He knew that it was a man. He knew he was in a neighborhood where a car was linked to an address that had gotten tickets there. So it wasn't a drug-prone neighborhood. That wasn't his reason for being there. He didn't know that it was key or any person connected to the investigation. He knew that someone drove up in a different car, not the one they were looking for, got out of the car, supposedly walked across the street too slowly. Cabell, it was described as the so-called counter-surveillance techniques. Went in a building, came out with a rectangular, a bag with a rectangular object or a rectangular shaped bag, and then crossed the street too quickly on the way back. Judge, that's certainly not probable cause. That's not even a reasonable suspicion. If he doesn't know who Key is, and he doesn't, or even know that he's a person connected to the investigation, he said so. He told Levanus to stay at the location because he didn't know, quote unquote, didn't know if this individual in the Toyota Sienna, if he was at all related to your narcotics investigation, A193. And then we've got the car chase. The flight as evidence of consciousness of guilt is perhaps the weakest form of evidence in all of criminal law, and I don't mean that as hyperbole. In state court, for example, they explicitly tell the jury it's worth very, very little. So even if the flight is to be considered as evidence of consciousness of guilt, that absolutely does not get the stop anywhere near probable cause. I still submit that it's not even reasonable suspicion because what happened back at the apartment is virtually nothing. You have literally a man crossing the street too slowly, coming out with a rectangular bag, and then crossing the street too quickly. I wish the court could see me wandering around downtown the way I walk around sometimes. We don't want to do that. My point, I don't mean to be facetious, but my point is that no one would dare stop me for having a rectangular bag and say that I'm- If you look at it from a different perspective, he's an experienced narcotics investigator. He sees this guy looking around for one or two minutes. He sees him carrying a plastic bag that looks like it has a rectangular object in it, which his experience tells him looks like the way you package drugs. He sees him very quickly enter a car, lean towards the passenger's side. After entering the car, he uses his cell phone. He tries to pull him over, and then he takes off on a car chase. That's not enough to stop him? Here's the problem with that, Judge. He doesn't know that the person who was in that car had any connection to this drug investigation whatsoever. So the idea about walking to- He doesn't know it, but doesn't he have a reasonable basis for suspecting that there was criminal activity going on? Not if he doesn't know that this person has anything to do with the investigation. It wasn't even a drug prone location. It wasn't the person in the car they were looking for. A rectangular shaped object, I mean, certainly, yes, money and drugs can be packaged in that way, but countless objects can be packaged in that way. And I'm concerned that there's this, we see this in so many hearings where the law enforcement simply says, well, rectangular object. In my training experience, I know that to mean drugs or money. And of course, yes, it can be packaged that way, but that's really not terribly compelling at all. What about the murder for hire issue? You're, you know- The, the, the- Can you hear a benefit? Sure, well, okay. I mean, the, if you look at that evidence as a whole, the government tried every which way, and even the court tried every which way to ask the witness over and over and over, why did you do this? What, what was the agreement? What was the understanding? And over and over and over, he responded only with these vagaries and, you know, talk about I want people on my side, on a team. The fact that the word money for, for one moment came out of his mouth is absolutely not enough, because his, his own- He said, he said it might be money, and then he, after the act, got $1,000. Well, there's, there's case law we cited, too, that the fact that he gets paid later on is not enough. I'm not saying it's something that can't be considered, but it is not. His independent unilateral hopes or wishes about what he might get, that is not an agreement for something of pecuniary value. The item of pecuniary value is supposed to be- The key is what, the key is what Key thought, right? That's, you're reading my mind, Your Honor, and there, in this case, there was not a speck of evidence that Key knew about the murder's planning, notwithstanding that they say he paid for it after. If you compare it to the, the individual that Judge Forrest ruled for on the Rule 29 motion, he was the one who supposedly set up the murder, and she said even as to him, there was no agreement. So how can there possibly be an agreement as to Key, who had no involvement in the murder whatsoever? It was a different record before Judge Forrest. It was virtually identical, Your Honor. If I'm wrong, correct me. I went through it. It is virtually identical. I don't think there was a mention of hold me down, give me money before Judge Forrest. I'll address that in rebuttal. I believe there, it was incredibly similar. I could not find any meaningful differences between those, between those records. I mean, you point out, you know, he only said give me money once, but how many times does he have to say it? Well, he has to say it in a way that when you read the testimony fairly as a whole, that it suggests there was an agreement for something of pecuniary value, not an offhanded thing he mentions among a laundry list of things that he was hoping for or wishing for. I mean, everyone in Amat's, you know, the government of the full quote is Matt was basically telling me they was going to hold me down, that I was going to be good. So I took that as hold me down, give me money, look out for me, watch over me. Well, even in that, even if you were to take only that exchange and ignore the rest of the testimony, even only in that exchange, it's not clear that the pecuniary value is a primary significance. He's saying Matt was quote unquote basically telling me and it was unclear what Matt was really intending. And he's saying I took it a certain way, a handful of different ways. That's not the primary significance is the pecuniary value. It was about money, wasn't it? I'm sorry. This whole thing was about money. It's not like that line from the Godfather where Don Corleone says someday I will call upon you and that day may never come for a favor. Right. That's that could have been take my daughter to the dance. That's not this. This whole thing was about money. It's it was about Kevin Wilson being accepted with these people, which is apparently way more important to him than an immediate payday, because if it was, he would have said, I mean, these are are rough and tumble people. It's not crazy to think that Kevin Wilson might have pushed back if he really thought it was all about money, as you're suggesting that he might have broached that in the slightest way. Again, keeping in mind, this is the same person. They put a gun to his head two days earlier, taking the testimony as a whole. It really doesn't seem like it was all about money. They put a gun to his head and said, oh, you're going to know who was he talking about? As having said this, basically telling me that was Matt. Matt put a gun to Kevin Wilson's head. So it was not Roger. No, Roger had nothing. He nowhere near any of this. According to the government's evidence, Roger was only involved at the very, very end. There is not a shred of evidence that that keys that that key intended for this to happen or that he knew about it or that there was any agreement between Wilson or key. Primer significance, community value. Thank you. We'll hear from the government. May it please the court. My name is Margaret Garnett. I'm an assistant United States attorney in the Southern District of New York, and I represent the government on this appeal. I'll begin in the order that the defendants presented with Miss Babylonia. I think one thing that Mr. Ray's emphasis on the doctrine in Kim about sequential analysis, the court has actually, even in the Prebaker era, rejected that as any kind of mandatory requirement in the court's opinion in Campbell, which is 967 F. 2nd 20 in 1992, and Rodriguez that same year, 968 F. 2nd 130. This court made clear that the analysis in Kim was not, didn't require a kind of, it's not intended to be a straitjacket. It doesn't require the sort of talismanic reference that I think Judge Kogan referred to in your question about, you know, is 46 enough? Is 57 enough? Even in the Prebaker era, when the guidelines played a significantly more important role, this court made clear that that kind of sort of recitation even then was not required. And I think certainly in the Postbaker era, it's not required. I think Judge Stein made very clear what his reasons were. There were, it was an extensive sentencing procedure with multiple submissions and the sentence was both procedurally and substantively reasonable. Turning to Mr. Davis, the, Mr. Davis's counsel emphasized repeatedly on the cursio that it's a process, questions about process, but in the cursio context as with everything else, I think results matter as well. And Mr. Rico is a very experienced and very well respected counsel. I think Judge Stein, the record makes clear, was very careful to make sure that Mr. Davis understood the conflicts and that he understood all of his rights. And the allocution is more than sufficient. And given the minimal conflicts presented, potential conflicts presented by the circumstances, his waiver of that right was clear. What about the argument that there should have been a standby counsel? Your Honor, I don't think the cases require that counsel be present. I, frankly, from a practical standpoint, both Your Honor and Judge Kogan, former district, Judge Kogan current, and Your Honor, former district judge, I just don't think in every case the resources alone would justify that as a requirement. Here, Judge Stein was very careful to tell Mr. Davis that even though he had retained counsel at that time, that he would appoint someone to, solely for the purpose of as long as he wanted. He asked him, we can adjourn for several days to give you as much opportunity as you want. And each time, Mr. Davis, the record's very clear, said, no, Your Honor, I understand all the issues. He was able to give his own narrative, cogently, to Judge Stein about what the potential conflicts were. And he said, it's not necessary, Your Honor. I appreciate it. He even said thank you at one point, but it's not necessary. I'm good to proceed with Mr. Rico. And in fact, I think the record of Mr. Rico's advocacy at the sentencing for Mr. Davis demonstrates that whatever the potential conflicts might have been in either instance, they certainly did not affect the representation or ripen into any actual conflict for Mr. Davis. Moving on to the 924C issue, Mr. Wilson mentioned at the very end that the law at the time of the plea should control. That's actually not correct. Particularly in this case of Rosemond, what doesn't represent a change in the law, but rather a clarification of the law and resolution of a circuit split that existed at the time of Rosemond, that Rosemond articulates what the law is. Not what it is today, but what the requirements of 924C, 80, and abetting are. And in the context of a continuing offense, here, this is a drug conspiracy that goes on for years. Mr. Davis is the leader of that conspiracy. All of these people that he talks about as having guns and having access to them and using them to benefit the conspiracy, they work for Mr. Davis. He's not some low-level pitcher where other people might be doing things. That's not this case at all. And that was very clear in the total plea allocution and to Judge Stein. Mr. Wilson mentioned in passing that Rosemond requires that defendants be asked a specific question about advanced knowledge. I don't think that that's an accurate recitation of Rosemond, nor is it appropriate to the facts of this case where you have a years-long continuing offense. Moving on to Mr. Key, I just want to make one point about collective knowledge. We certainly argued that before Judge Stein, and we argued it in our briefs. Judge Stein's opinion makes clear that he did not rely on that doctrine. I think the government has made its arguments before Judge Stein and this Court that that is an alternative basis that can, in this case, expand the facts available. But it's not necessary, and that's demonstrated by the fact that he did not rely on it. You take that position still in light of Hussain? Well, Your Honor, I think the Hussain opinion is there's a passing mention in a footnote. It's not even in the body of the opinion. It's not really a passing mention. It's a very lengthy footnote talking about the doctrine. But I think it is a footnote, and it doesn't, in my view, do not play a significant role in the Cunningham decision. The defendant issues Cunningham, so I think of the case that way. But I think the most important point here is that Judge Stein plainly did not rely on that doctrine here. So I think even if the Court is troubled by the footnote in Cunningham or thinks that there's some ambiguity in what the rule is, Judge Stein didn't rely on it. And I think Judge Kogan's recitation of just what was known to Investigator Cabell, and certainly as the facts developed over the course of each decision, Investigator Cabell was clearly concerned enough about what he had observed and the suspicion that it generated. Tell us what he saw that provides probable cause. So the entire team, which is a narcotics enforcement team, is at a location on Bruckner Boulevard, specifically... We're just talking about Cabell's team now. Yes, yes. Yes, Your Honor. So it's Cabell and Agent LaVonis. They're part of the same team at the DEA, the task force. And there are, if I recall correctly, five or six other law enforcement officers who are there, and they're in multiple vehicles. And Investigator Cabell, over the whole team that's there at the surveillance, is sort of the higher-ranking supervisor. He's the supervisor. They know that they're there on Bruckner Boulevard to watch a particular address or set of buildings because they are associated with an ongoing narcotics investigation. They're looking for a particular car that doesn't reside in that area but has received a number of parking tickets, and the car is associated with the targets of the investigation. That's the maxima with the particular license plate. While they're waiting there at that location, alert to the fact that they're looking for evidence of the participants in this narcotics conspiracy. Investigator Cabell sees the Toyota Sienna arrive. He sees a man get out and engage in what he described at some length at the suppression hearing as counter-surveillance techniques. Very long pause at the curb with extensive sort of surveillance of the street when he said there was no traffic, no oncoming traffic whatsoever. He then crosses the street, again looking around, goes into the building. Approximately five minutes later, comes out. Very quickly proceeds, in sharp contrast to how he behaved before, very quickly proceeds to his car and gets in. Based only on that, and of course it's an object... And what he's carrying, too. Oh, yes, yes. He sees a plastic bag that he did not have before that seems to be weighted down with a heavy rectangular object, which Investigator Cabell said that he suspected might be either narcotics or money packaged in the way that he was familiar with from narcotics cases over his career. He was suspicious enough by those circumstances to direct the entire team, other than Agent LaVonis, we're going to follow this car. This is important. And, of course, it's an objective test, not subjective, but I think the court is certainly entitled to, Judge Stein was certainly entitled to weigh that in his consideration given Investigator Cabell's experience and his assessment of what the situation demanded from a law enforcement perspective. So, they leave behind only Agent LaVonis to continue watching for the Maxima. Investigator Cabell and every other member of the team then proceed to follow the Sienna. And as they're following him at some distance, Investigator Cabell observes Mr. Key use his cell phone while he's driving. He doesn't know at that point that it's Roger Key. He observes the driver use his cell phone and knows that that could be the basis for a legitimate traffic stop. So, even if he didn't have reasonable suspicion yet, he said, you know what? My plan is to pull this guy over and then we'll see. As they signal to Mr. Key to pull over, then what proceeds is not some mere flight from law enforcement, but a five to eight minute exercise in a crowded area of the city in which Mr. Key drives on the grass, drives at a very high rate of speed on the shoulder of the highway, is weaving in and out of cars, engaging in evasive maneuvers for close to 10 minutes while multiple law enforcement vehicles have sirens going, announcing on the public address system one of the, I believe it's Agent Kuzman, pull over, pull over, police, police stop your car. And that's the point at which Mr. Key then drives on the shoulder of Interstate 95. When they're finally able to stop the car, it is as he's weaving through an intersection on Stilwell Avenue in the Bronx. And I just don't think that there really is any reasonable question that at that point, based on everything that had occurred, there was probable cause to arrest Mr. Key and to conduct a vehicle exceptions search of the car, which is what transpired. Sotomayor, let me ask about the nature of the search. I mean, they stop and the car eventually, and they find the green plastic bag and seize that, but then it's decided not to proceed with an arrest or to go forward because of the pending larger investigation and having tactical reasons for not wanting to do that. Why is it all right for Officer Cabell to continue to search the Sienna and to go further? There's going to be no inventory search, right? Because there's no, they're not taking the car. Yes, but the cursory search that Investigator Cabell did of the entirety of the Sienna as he was moving it to a safe location happened before that decision was made. So if you look at the sequencing, when Investigator Cabell, they can't, of course, leave the car in the middle of Stilwell Avenue. So he's moving the car to a safe location, Roger Key is under arrest and is being taken to the precinct for processing. As Investigator Cabell pulls the car over, then he does a cursory search, a sort of prefatory to inventory search of the car to just let me make sure there's nothing dangerous here, whatever, assuming they're going to bring the car. Why is it important to know, since Key is under arrest, whether there's anything dangerous in the car? Well, because the law enforcement is now in possession of the vehicle. And whether it's under community caretaking or inevitably prefatory to an inventory search, it is common practice and accepted practice by this court and others that when law enforcement are in possession of a vehicle, they are entitled to both protect themselves against accusations of theft by making an assessment of what's inside the car, as well as make sure that something that's in their control, much like a prisoner under arrest, doesn't have within it anything that could be dangerous to either the officers or the public. So they are taking possession of the car. And the expectation of Investigator Cabell at the time he does that is that he or someone else will be moving the car to a DEA or NYPD lot. It's only after that occurs that he's told, oh, it turns out this guy is the subject of a major federal investigation, different FBI-based investigation. We've spoken to the prosecutors. We're not going to arrest him. And so instead of, as he had planned, taking the car then for a full formal inventory search, he releases custody of the car, locks it in a safe place, brings the keys to the precinct and returns the keys. So your position, he's entitled to search the whole car as soon as he has possession of it? I think when he has possession and the owner is under arrest, and the expectation at that point, as everyone believed, was that he would be processed for arrest and they would be Yes, he's entitled to, certainly on location, make a cursory search preparatory to an inventory search. And whether under community caretaking or inevitable discovery inventory search, I believe the search was proper, yes. Could you also address the apartment search and the cell phone seizure there, please? So the apartment search occurs when the agents arrive to arrest Mr. Key on this case. And the primary witness at this press hearing was FBI Special Agent Brendan Kenney, who I just am repeatedly credited. So they arrive to arrest Mr. Key. The entire proceeding is... So they have a warrant to arrest him, but they don't have a warrant to search the apartment, is that right? That's correct. So you're relying on his consent to looking for drugs or guns. The combination of plain view, because they're lawfully in the apartment to effectuate the arrest of Mr. Key, plain view and Mr. Key's consent. So I'm concerned about my understanding is that the law allows police lawfully in a location to seize an object if it's incriminating characters immediately apparent. And it seems to me that the cell phones and iPad, they're incriminating nature. Their character is not immediately apparent. They may contain incriminating evidence, but a cell phone by itself is not incriminating. Everyone has cell phones. Your Honor... So why is that an incorrect analysis? Yeah. It's correct that everyone has cell phones. I think that the assessment of whether it's incriminating character is readily apparent to the officers who seize it has to be evaluated, whether it's a cell phone, keys, a business card, whatever it is, has to be evaluated in the context of the case and everything that's known to those agents. But aren't you really suggesting that it would be evidence that would be useful later on? But in and of itself, a cell phone is not incriminating, is it? But Your Honor, they don't search. The issue here is going to be the seizure of the cell phones, because the search of the cell phones takes place only after a warrant has been obtained from a judge once they've been seized. So the question is, was the incriminating character sufficient for the seizure? And I think in the context of this case, where Agent Kenney testified and Judge Stein, at that point, aware of the facts of the case, credited that this case is one in which the use of phones, both for texting, for photos, for communication about the drug business, as well as the murder plots, was very well known to... But again, that suggests that they may contain evidence that would be useful in furthering the prosecution. And my concern is that it would have been possible, it seems to me, to get a warrant to search the apartment and to seize items located therein, including cell phones. But a cell phone, and even multiple cell phones, having two myself, it's not in itself an incriminating item. It's not like a knife that's dripping with blood that, you know, is incriminating on its own. Your Honor, but let me give another example of evidence that's not incriminating on its own, that everyone has, like the keys to an apartment or keys to a car. When an agent, in a place he's lawfully permitted to be, or with consent, here he had both, sees keys sitting on a drawer, or sees a key to a U-Haul storage facility, which is a lawful item that many law-abiding people have, that's not standing alone incriminating. If the agent in question knows that in this case there's evidence that a U-Haul storage facility was used to store grow equipment or something of that nature, they certainly would be entitled to seize those keys, get a warrant for the contents of the... The question is whether plain view goes that far, or does the contraband nature have to be immediately apparent, not to someone who's versed in the case, but to anyone who would happen to see that? Drugs are drugs. Guns are guns. Do you have to graft the agent's knowledge of the case onto the item in order to make the plain view doctrine applicable? And I think your best analogy is not the one you're giving. It's that if you walk into an apartment and you see a $100 bill sitting on a table, nothing wrong with that. If you see bundles of $100 bills, anyone would say that's probably evidence of a drug transaction. Might not be, but there's reason to believe it is. If there's two cell phones, then I think Judge Carney is right. Lots of people have two cell phones. If there's five cell phones, then anybody might well think that's evidence of a drug transaction. How many cell phones were there in plain view? Your Honor, I think that they recover either four or five cell phones plus an iPad. I don't have the exact number at my fingertips, but it was more than two. Well, that might matter. With an iPad. But, Your Honor, I don't think we have to choose one or the other, right? I think that here they had all of those things. There was an apartment where clearly Mr. Key is the only occupant. It's the early hours of the morning. He's in his underwear. It's a small apartment. No one else is present. There are more than two cell phones as well as an iPad in the context of this case, which I do think is important because many plain view cases involve the seizure of things like keys, a business card, a letter, an address book, things that law-abiding people, almost every law-abiding person has, that the incriminating character in the context of the case is apparent. And I think here it's all of those things together. Possibly incriminating nature is what you're saying. Yes. But therefore, it's evidentiary value rather than, I mean, there's some line drawing. But I don't want to, before you sit down, you're almost out of time. Could you please address Frampton and the pecuniary value question? Because I am concerned that the statements that mention money in the testimony were made by an individual other than Roger Key to the shooter, and that the shooter's unilateral expectation is really all we're left with, and that it wasn't even very clear that it was going to be money, that it was going to be being taken care of, being associated with the group. And I wondered if you could explain why that's an inadequate analysis. Sure. And, you know, it's funny because, although this point is, I'll concede, not well fleshed out in our brief or any of the briefs, as I was preparing for the argument and thinking about this case, it occurred to me that, as is so often the case, perhaps juries are smarter than the lawyers. Because one thing that I think is important here, and again, not well fleshed out in our brief, I'll concede, is that the only conviction that we are talking about here is Roger Key's conviction for the conspiracy to commit murder for hire. The jury acquitted him on the substantive counts, as well as the 848E count that's associated with that murder. And so I think the fact that he was only convicted on the conspiracy makes this analysis even more focused on Roger Key, because as Richeson, the Richeson case from the Seventh Circuit, holds that when the defendant is the solicitor, which is the role that Key was in, he's the leader of the conspiracy and the ultimate boss of this 321 crew that set out to kill Terry Harrison. It is the solicitor's intent that controls. And even more so, I think, in the case of a conspiracy, the defense is very focused on what Kevin Wilson believed was the case, and their emphasis on Judge Forrest's opinion talking about, well, there has to be a median. Tell us what the evidence is of his intent, of his involvement even. So I think that it's definitely a case that is circumstantial and that requires a jury to draw inferences from the totality of the facts, and the case is both in this circuit and the Seventh Circuit. What are the facts? So the facts are that there was ample evidence that Roger Key was the leader of the 321 crew, that there was an extensive ongoing war between the Cortland Avenue crew, which Harrison was the head of, and the 321 crew, which Key was the head of, which prior to the murder of Terry Harrison had included a variety of shootings and stabbings and so on, that Matt Davis worked for, and the other members of the crew who were present for many of these things, Davis, Toreen Joseph, Beans, other participants, worked for Roger Key, that Roger Key was present at one of the meetings preparatory to the murder, that he was off to the side and Kevin Wilson saw Matt Davis go and speak to him and then come back and they continued their planning of the murder. I think that Matt Davis, of course, makes the offer to Kevin Wilson, which among the reasons listed, Kevin Wilson said he expected he would be paid. I think one of the most significant facts that supports the jury's conclusion that Roger Key intended for the murder to be committed in exchange for money is that with less than a day, a couple of hours after the murder, with no request by Kevin Wilson for money, Matt Davis calls Kevin Wilson and says, it's payday. Everyone knows what that means. It's money in exchange for work. It's payday. Let's go. And Matt Davis doesn't give him the money. He says, get in the car, we're going. He takes him to Harlem. Who is waiting there? Roger Key. Matt Davis and Roger Key have a brief conversation that Kevin Wilson's not a part of, and then Kevin Wilson is waved over. Roger Key gives him $1,000, thanks him for the work, talks about, you know, this is how you get money, this is how you're successful. He's talking about his own accoutrement of wealth, his jewelry and things of that nature. Thanks him for the work and pays him. In light of the jury's verdict, in which this court is to draw all inferences in favor of is sufficient to support the jury's verdict on the only count that's at issue here, which is a conspiracy to commit murder for hire. I say I'm over. Thank you, Your Honor. We'll hear a rebuttal. Your Honor, just briefly, we acknowledge in our brief that under Kim Campbell Rodriguez, a sequential analysis in connection with an upper departure is not a mandatory requirement, but Judge Kogan, it is a means to an end and the end is whether or not there's a fair procedure and what that sequential analysis or some other kind of analysis is seeking to require is that the procedure be a fair consideration of mitigating evidence and circumstances, which we submit here really wasn't done. There was powerful mitigating circumstances here, not amounting to a duress defense, but there were 48 calls by Ms. Babylonia to 911, all involving abuse that she suffered at the issuance of a restraining order, 10 years of abuse. She in fact herself was arrested until the arrest photo revealed that she was the one who was bruised. What a sequential analysis or a fair procedure would have gotten at, if the starting point had been 30 to 37 months, is what are the countervailing circumstances, not amounting to a complete defense? The district court gave passing reference to that. We think that was simply lip service. He said that that provided context but didn't excuse the conduct. Well, no kidding. I mean, she pleaded guilty to this offense. There isn't an excuse for that. She's acknowledged criminal culpability. The question is, as a sentencing matter, whether those circumstances were sufficient in mitigation to consider things like her relative role in the offense and other matters. But to the extent you're substantively challenging the sentence, is it possible that what the judge was thinking, and again, not articulating because I'm talking about the substance, was that that consideration had already been taken into account in the method in which she was charged? Well, if that's what he was thinking, he certainly didn't say that. And I understand why I asked substantively, not procedurally. Well, and, you know, I think there's an aspect to this where, you know, look, Roger Key was sentenced to life in prison plus 30 years. So I guess in context, you know, you can talk about, well, geez, five years is, you know, a gift. What are you complaining about? But it was a stalking offense. And the judge seemed to give great weight, I will say this, this is the only inference I can draw, that there should be something that was significant about the fact that she pleaded guilty to an offense that also carried a mental state of intent to kill. Well, that's not what she pleaded guilty to. And so that's really our argument there. I will say just one last thing. I see that my time is up. The 30 to 37-month range, if Your Honor, Your Honors are considering whether a remand is appropriate, she's already served that. She has approximately 18 months remaining due to be released in March of 2018. I would ask, Your Honor, if you're, that the court is considering a remand here to, frankly, consider that in conjunction with whether or not enough is enough already and that she should be immediately released. Thank you. Thank you. Mr. Wilson. Thank you, Your Honor. Just a few points. The idea about Rosemont, as the government said, clarifying the law, not expanding the law, if the court looks to the government's brief at page 90 to 91, there's a rather lengthy paragraph, which includes a quote or reference to U.S. v. Rivera, saying that the holding of Rosemont expanded aiding and abetting liability under Section 924C. And then there's some other stuff about that. So in terms of that point, which I think is part of why my focus about Mr. Davis' change of plea is about when it happened and what the law was then. The law changed afterwards. It got expanded. And it became easier to aid and abet. On the questions about the Curcio hearings, the government calls it minimal conflicts that we have here. I think one of the most obvious conflicts in any case is when a lawyer represents someone having previously represented a co-defendant in the case. It's probably a step down from representing both defendants at the same time in a case, but it's a close cousin of that scenario. And the government also made a comment that the circumstances here wouldn't justify this in light of the resources at issue, which essentially is creating two systems of justice, one where the indigent don't get the benefit of consulting with counsel and those who have the resources can always go out and get a second opinion or raise those concerns. Finally, getting back to Your Honor's question about kind of what's the substantive difference between how we handle this, I think back to any number of client meetings I've had, including my old days in civil practice as well. How many times was it different when we sat there with our clients in the conference room versus when they were in the courtroom or under fire at a deposition? It is different. It is substantially different. And the defendants need that opportunity to meet with someone because that lawyer is the person who's going to be able to really dig and see what are the conflicts, what are the risks, and then represent them in the courtroom and speak on their behalf. Because, remember, this is one of the rare situations where a judge interacts directly with the defendant. Otherwise, it happens at a change of plea. It happens at sentencing only if the defendant elects to speak. And it happens when they plead not guilty or if they testify. So we should be doing everything we can to protect them in that moment. Thank you. Mr. Caliendo. Your Honors, the government drew a lot of attention to the way Key was driving when they tried to pull him over. And if law enforcement wanted to arrest him for if they think he committed a misdemeanor and not just some arrestable. I mean, they could have stopped him for a traffic violation. But they had a basis for doing it at that point. Yes, sir. They could have arrested him for a traffic violation. Correct. But then they're either stuck with a search incident to arrest, which the government concedes in their briefs that can't help them here, or they're limited to probable cause for evidence relating to the arrestable offense, the traffic offense. Well, the government's saying that they took lawful possession of the vehicle having arrested Mr. Key and that they're entitled at that point in anticipation of an inventory search and also for safety reasons to do a general cursory search of the vehicle. Do you think that's wrong? I do. Cabell was not searching the car to protect himself from accusations of theft. In a motive manner? Well, absolutely, because if they're saying it's an inventory search or some kind of pre-inventory search, then that's what it should be. But we know he was searching for evidence. But if you find the same things, regardless of motive, why does motive matter? Well, because for inventory search, you have to actually have been doing an inventory search. Otherwise, it's an unlawful evidentiary search. Here, Judge Stein made an error and assumed that Key was back at the precinct and they were already sort of processing arrest. The minute Cabell looked in that car, he saw the license plate. He realized who Key was. He said, you better get someone from the U.S. Attorney's Office on the phone because we have to decline to prosecute the case. An inventory search was not inevitable, which it needs to have been in order for inevitable discovery to save this. And we know he wasn't doing an inventory search because he wasn't looking to see if there was a bomb in the car that was going to hurt him when he moved it. He was opening Pelican cases and reading supposed drug notes. It had to have been inevitable, and it wasn't. We know it was not inevitable because it didn't happen because they immediately called off the arrest. With regard to the phones, Your Honor, I have to bring it back to myself again. How many phones were there, by the way? I believe the government's correct about five or so, four or five. My wife has two devices and an iPad. I have a device and an iPad. There's multiple old devices sitting in our drawers. Your family needs to simplify their lives. But my point, Judge, is that in the 80s and 90s, it was this notion that only doctors and drug dealers had beepers and cell phones. But those days are so long gone, and it's a long time coming that an appellate court needs to say exactly what Your Honor said earlier, that phones by themselves are simply no longer incriminating. It's not. But I'm looking at what the Supreme Court said, that the seizure of property in plain view involves no invasion of privacy and is presumptively reasonable assuming that there is probable cause to associate the property with criminal activity. In the totality of the circumstances here, were there five phones in a drug conspiracy, why isn't it a probable cause to associate the property with criminal activity? Because it's his home and he has a significant other and daughters or a daughter of age to use a cell phone. It's not a stash house. There's not scales and drugs everywhere. This is a residential apartment where there is, frankly, no other indicia of the drug operation. And what's your position on taking the car keys to the Toyota and the Bentley? I believe counseled, I believe trial counsel conceded that he did not contest the Bentley keys. We're not claiming error there. Okay. Thank you. We will reserve decision.